63 So.2d 584

**ROBERTS v. STATE.**

**5 Div. 552.**

Supreme Court of Alabama.

Jan. 19, 1953.

Rehearing Denied March 19, 1953.

Walker & Walker, Opelika, and Wilbanks & Wilbanks, Alexander City, for appellant.

Si Garrett, Atty. Gen., and Robt. Straub, Asst. Atty. Gen., for the State.

FOSTER, Justice.

Appellant was convicted of murder in the first degree for the killing of Kyle Young on Easter Sunday afternoon, April 13, 1952, and sentenced to imprisonment in the penitentiary for life. The shooting occurred at the home of appellant about eight miles from Dadeville. That afternoon, around 1:30, a telephone call was made to the jail at Dadeville by Mrs. Irene Yarbrough, a sister of Mrs. Fulton Roberts (her husband being a son of appellant). Mrs. Yarbrough sought to speak to the sheriff, but he was not available and there was no one in the sheriff's office, so she had her conversation with the jailer. She testified that she told jailer Treadwell she wanted law officers to come to the house of Bill Roberts (this was not the appellant's house); that Mrs. Fulton Roberts (who was called Lossie) wanted to see a law officer, and to come right away. Mr. Treadwell testified with respect to that call, and stated that Mrs. Yarbrough told him to tell any of them (meaning the sheriff's force) to come quick, and she said that Fulton Roberts and his father, who is appellant, were having an argument. They lived across the road, some four to five hundred yards, from each other but in sight, and that she wanted some law enforcement officers up there and wanted them quick. When that conversation was communicated to Kyle Young, the deputy sheriff, he solicited Mr. Watson, the chief of police at Dadeville, to go with him and the two immediately set out on the trip and went to the home of Bill Roberts, as they were requested to do. When they arrived at the home of Bill Roberts, Kyle Young was told by Mrs. Fulton Roberts that they (referring to Fulton Roberts and appellant) had been down there drinking and fighting, and that it had been going on for sometime every week end, and that they had a gallon of whiskey hidden down there in the cow pasture, and she wanted the officers to go down and see if they could make them behave themselves.

Mrs. Fulton Roberts, testifying as a witness for the State, said she told the officers when they arrived at Bill Roberts' house that appellant and Fulton Roberts were

fussing and drinking and trying to fight. That the officers thereupon drove from Bill Roberts' house to appellant Edgar Roberts' house which was not so far away. There was no disturbance going on at that time in appellant's house or on his premises. The difficulty began at Fulton's house about 12:00 o'clock and they fought on out to the yard; and that they were fighting or scuffling. That Fulton threw some bricks at his wife.

Watson who accompanied Young on the trip was a State's witness, Young having been killed on that trip. Watson testified that when they arrived at appellant's house Fulton Roberts came to the door and said "come in, Mr. Kyle. How are you felling?" Young said to him, "what is the trouble? They tell me you are here drinking and raising the devil." Fulton said "there is nobody been drinking or raising the devil, and there is not a drop of liquor in the house and has not been." Watson testified that he could then see appellant lying on a cot in the combination living and bed room. That appellant was drunk when they arrived and throughout the transaction, and that Fulton Roberts was also drunk. That they went into the living room where appellant was lying on the cot, and Mrs. Roberts, the wife of appellant, came in from the kitchen and stood in the doorway between the two rooms.

The officers are not shown to have had a search warrant or any other kind of warrant with respect to appellant. It does not appear from the evidence that the officers offered to arrest appellant or Fulton Roberts or went there to make a search of the premises. But Watson testified that appellant's wife told them that "there is not a drop of liquor in the house and if you think there is any anywhere, look." The officers then went into the kitchen. The deceased Young then said "Watson, look and see if you see anything." Watson testified that they could smell corn liquor in some glasses on the table. Appellant's wife went into the kitchen and sat on a little green painted box, which it developed was a meal and flour bin. Mrs. Roberts then opened the dish cabinet, and said look in here. Watson became suspicious when

she sat down on the bin, that there was whiskey in it, so he said "lady, let me see in this little box you are sitting on." She got up and said this is a meal and flour bin, and there is nothing in it. Watson thereupon opened it and found two pint bottles, each having about a drink in it. Then Mrs. Roberts observed, "I have rheumatism in my leg and Dr. Banks told me to take whiskey for it, that is the reason the whiskey is here." There was no other search made and no effort made to arrest anyone.

It was at that time, according to the testimony of Watson, that the defendant arose from his cot and began cursing them violently and threatened to kill them, having a twenty-two rifle in his hand. There was no shooting done immediately, but the witness Watson drew his pistol and Young told him not to shoot appellant. Young got hold of appellant's rifle, and appellant snatched it from him and ran out of the house, followed by Young, Watson, Fulton Roberts and Mrs. Roberts. Watson continuing to testify stated that appellant got about ten or fifteen feet from Young, and was then some sixty or seventy feet from his house, and he threw up his rifle like he was taking aim, Young then pulled his pistol and appellant fired his rifle, hitting Young. Young returned the fire and hit appellant and exclaimed, "Watson, I am shot through and through." Watson was also firing his pistol. There was evidence that Fulton Roberts then said to Watson, "don't shoot my daddy". Watson testified that he shot six times at the appellant with a forty-five pistol, and that Young was firing at appellant with a thirty-two pistol. That appellant followed toward the car and emptied his rifle shooting ten or eleven times. Watson thereupon hit Fulton over the head three time with the barrel of his pistol, and Fulton fell flat on his face. That Watson took the rifle from appellant's hand and hit him under the chin with his fist, and he fell backwards with his head near the steps of the house. Defendant, his wife and Fulton contradicted some of the material facts to which Watson testified.

Watson drove from the scene of the difficulty, leaving the appellant and his son Fulton Roberts lying unconscious on the

ground. After taking Young to the hospital, Watson returned to appellant's house with other officers. They found appellant on his cot wounded from shots made by the officers. Watson testified that appellant was drunk and they carried him to the doctor's office shortly thereafter. The doctor also testified that he was drunk. No one claimed that appellant and Fulton were not drunk.

Both Watson and the doctor were permitted to testify to statements made by appellant while in the doctor's office, which were very damaging to the appellant. That appellant was cursing bitterly, and stated that "he killed the God damned son-of-a-bitch, and everyone of you ought to be dead, God damn you," and that "if the God damn son-of-a-bitch was living, he would kill him again." In that connection, Dr. Banks testified that appellant was drunk and unreasonable. Substantially the same statements were made by appellant about four hours later in the jail in the presence of the members of the sheriff's force and several other people. In that respect, Dr. Banks testified that appellant was still drunk, but that he knew him and was not unconscious.

The objection made to the testimony of what appellant said on those occasions was directed to the fact that he was too drunk, according to the evidence to which we have referred, to be capable of making a voluntary statement.

We recently had occasion to give careful consideration to that question in the case of Redwine v. State, Ala.Sup., 61 So.2d 724.[1] We refer to that case for a full discussion of the question and the authorities in support of it. We there held that proof of insanity as of drunkenness must go to the extent of showing that the defendant was substantially a maniac, and was disabled from "comprehending the effect of his admissions, or from giving a true account of the occurrence to which they had reference," in order to exclude it as being thereby involuntary. But that his condition in that regard was admissible in evidence, so that the jury could give such

weight and credit to the alleged confession under those circumstances as they might see fit.

We do not understand that objection was made to evidence of the remarks made by defendant on the ground that they were not a part of the res gestae and were made some hours after the fatal rencounter. The principle is well established that declarations against interest, made by the accused before or after the commission of the homicide, tending to connect him with the crime in question, are admissible against him if they are shown to have been voluntary, whether or not they are a part of the res gestae. Patty v. State, 242 Ala. 304, 6 So.2d 399. The principle is also expressed as follows: "The acts, declarations and conduct of the accused, against interest, are always competent", Woodard v. State, 253 Ala. 259, 44 So.2d 241, 245, and such acts and declarations, unless they are a part of the res gestae, are not admissible in favor of the defendant. Pitts v. State, 140 Ala. 70, 37 So. 101; Maddox v. State, 159 Ala. 53, 48 So. 689; Bass v. State, 219 Ala. 282, 122 So. 45.

It is insisted for appellant that there was error by the trial judge making a statement in the presence of the jury when overruling an objection to the introduction of a confession, alleged to have been made by appellant, on the ground that it was not voluntary because of his drunken condition. The statement by the judge was "that is a matter for the jury to determine". It is correctly pointed out by counsel for appellant that it is for the judge to determine the admissibility of evidence of a confession in regard to whether it was voluntary as in other respects; that the province of the jury in that connection, if the judge holds that the confession was satisfactorily shown to have been voluntary, is to give to the evidence of the confession the weight and credit it should have in an exercise of their sound judgment, but the jury cannot determine that it was involuntary and, therefore, reject consideration of it as evidence. Johnson v. State, 242 Ala. 278(6), 5 So.2d 110; Redd v. State, 69 Ala. 255; Vernon

v. State, 239 Ala. 593(9), 196 So. 96; Lockett v. State, 218 Ala. 40, 117 So. 457; Phillips v. State, 248 Ala. 510(15), 28 So. 2d 542; Reedy v. State, 246 Ala. 363, 368, 20 So.2d 528; Hicks v. State, 247 Ala. 439, 442, 25 So.2d 139; Logan v. State, 251 Ala. 441, 444, 37 So.2d 753.

It is not clear from the statement of the judge, referred to above, in overruling the objection, whether he meant that the jury should determine whether the confession was voluntary or whether the jury should determine what effect on the testimony his drunken condition should be accorded by them. But whatever he may have meant, it was a statement apparently made to the attorney making the objection and giving his reason for so ruling. The same statement was made twice in connection with a similar situation. We do not find in the oral charge any direction to the jury in that respect, nor a written charge given or refused. If we should find this to be an erroneous statement of the applicable legal principle, we should not reverse the ruling of the court when the ruling was soundly based for other reasons, as it was.

Appellant's counsel also insist that there was error in overruling their objection to the introduction of certain items of clothing worn by deceased at the time he was shot. The claim is made that such proof is only corroborative of the uncontradicted evidence showing the location of the deadly wound, the size of the bullet which inflicted the wound and its range through the body of deceased. We have repeatedly held that under those circumstances, there was no reversible error in so ruling. Ray v. State, 253 Ala. 329, 45 So.2d 4.

It is also insisted that there was error in allowing testimony of alleged details of the difficulty between appellant and his son Fulton, which gave rise to the call for the law officers. Their houses were close to each other, and as said above, in view across the road. The details objected to were that they had a difficulty, a fight Easter Sunday about twelve o'clock noon: both having weapons, but were not fired. Mrs. Fulton Roberts (called Lossie),

her brother Coolidge Patterson and her sister Irene Yarbrough left Fulton's home and went to Bill Roberts. Mrs. Fulton Roberts requested the others to go to the home of Partridge, and there telephone for the officers. They went to Partridge's house and called for the officers. They then started back to Bill Roberts, and on the way the officers came and picked them up and carried them to Bill Roberts. On the way Irene Yarbrough told the officers: "Lossie said that they are down there fighting and drunk, but go up to my sister's because she wants to see you first." When they reached there, Mrs. Fulton Roberts (Lossie) told them, according to Mrs. Yarbrough's testimony, that appellant and Fulton "were having a fuss and a fight and were drinking down there at that house". She testified further that they were not to say fighting, just scuffling; that Fulton took appellant home, and they were not fighting then.

Watson testified that Mrs. Fulton Roberts told them that they had been down there drinking and fighting, and that it had been going on for some time, every week end, and that they had a gallon of whiskey hidden down in the calf pasture, and she wanted him to go down and see if he could make them behave themselves.

We cannot agree that such evidence was in any way objectionable. It all showed the occasion for the officers to be there, and to shed light on the meaning of their conduct and their purpose. This court has expressed the following principle on that theory in Jordan v. State, 81 Ala. 20(2), 1 So. 577:

"As a general rule, all the parts of one continuous transaction, though not shown to have any immediate connection with the offense which was the consummation of all the circumstances, and facts proximate to its commission which tend to shed light on the main inquiry, are admissible as evidence; and under an indictment for murder, it being shown that the homicide was committed at a house where all the parties, with others, were engaged in a frolic where there was dancing and drinking, all the occurrences of the evening may be regarded as constituting one contin-

uous transaction, and are admissible evidence under this rule." See, also, McCoy v. State, 232 Ala. 104, 166 So. 769; Stallings v. State, 249 Ala. 580, 32 So.2d 236.

■ Appellant insists that the court erroneously allowed more than one counsel for the State to examine the witness Dr. Banks, in violation of Rule 18 of the Circuit Court, Code 1940, Tit. 7 Appendix. This occurred when Dr. Banks was recalled in rebuttal as a witness for the State after he had previously been examined by the solicitor when an attorney assisting the solicitor undertook to examine him. Defendant makes objection to such examination because of Rule 18, supra. The court overruled the objection and defendant excepted. Counsel refuse to consider McKinley v. Campbell, 217 Ala. 139, 115 So. 98, as authority supporting the ruling because in that respect it was dictum and they call upon us to enforce the rule as written. The Campbell case in that respect does seem to have been dictum, but we think it is a proper interpretation of the rule and that it is in the discretion of the trial court to permit more than one counsel to examine a witness. Trial courts generally so act in respect to it.

■ The refused charges are 1, 2, 3, 4, 11, 12, 13, 14, 15, 16, 19, 20, 21, 30, 31, 32, 33, 34, 36, 47, 51, 63, 64, 68, 69 and 70. The first four charges are each an affirmative charge that the jury cannot find defendant guilty. There is no basis on which error can be predicated in refusing them.

Charges 11, 12, 13, 14, 15, 16, 21, 30, 31, 32, 69 and 70, in various language separately instruct the jury that under the facts shown by the evidence, deceased Young and Watson had no right to arrest the defendant, or to enter his residence or to search it, and that they were trespassers upon defendant's premises.

As we construe the evidence, it does not show that the officers went upon defendant's premises to make a search or an arrest. There is no tendency of the evidence to that effect. They were there at the instance of Mrs. Fulton Roberts, the wife of defendant's son, to make Fulton and defendant behave themselves; that they had been drinking and fighting and had a gallon of liquor in the calf pasture. They did not go there in search of liquor or anything else or to arrest anyone. The liquor question arose after they had gone into the house. Watson testified that they smelled some liquor and defendant's wife told them to look if they wanted to. She denied this. The only "looking" they did was in the meal and flour bin where she had been sitting and where there were two whiskey bottles practically empty. It was then, he said, that defendant began to abuse and curse them and got his rifle in a fighting attitude. So that, eliminating the search and arrest feature of the contention, the inquiry is whether on other considerations the officers were trespassers in entering the premises of defendant under the circumstances stated. However, the court charged the jury fully and correctly on the effect of making an unlawful search and arrest, properly defining them, and left it to the jury to determine whether that was such a search or arrest.

■ "Any entry on the land of another without express or implied authority is a trespass to such realty." Foust v. Kinney, 202 Ala. 392, 80 So. 474, 475; Alexander v. Letson, 242 Ala. 488(9), 7 So.2d 33. But "it is not a trespass to visit a person peaceably on business between the parties." One without legal process may sometimes enter peaceably on the premises of another and not be a trespasser. Lehman, Durr and Co. v. Shackleford, 50 Ala. 437.

■ The information which the officers had received justified a reasonable belief that at least an affray had been committed by appellant and his son Fulton in the public road between their houses. An affray is the fighting of two or more persons in a public place to the terror of people. Thompson v. State, 70 Ala. 26; McClellan v. State, 53 Ala. 640; section 17, Title 14, Code.

■ It is the statutory duty of the sheriff and his deputies, among other things, "to ferret out crime". Section 5, Title 54, Code; Jones v. Buckelew, 247 Ala. 475(6), 25 So.2d 23.

■ The deputy sheriff was called upon by the wife of one of the participants "to come out there and make them behave".

The officers went upon the premises peaceably upon such request, with no apparent purpose to arrest or search the premises, and on the invitation not only of Mrs. Fulton Roberts, daughter-in-law of appellant, but also of Fulton Roberts who was on the premises of appellant at the time, according to one aspect of the evidence. We think those refused charges numbered above were refused without error, not only for the foregoing reason but some of them probably on other grounds which we will not undertake to analyze.

Refused charges 19, 20, and 33 seek to have the jury instructed in charges 19 and 33 that Watson was a trespasser, and in No. 20 that the State has failed to show that Watson was legally authorized to attempt to arrest defendant, and that in making the attempt he committed a trespass which defendant had a right to resist with force not greatly disproportionate to his threatened injury.

A complete answer to appellant's contention is stated above as to other charges, in effect there is no evidence that Watson and Young were attempting to make an arrest or a search, or that they entered upon appellant's premises unlawfully, or committed a trespass while on the premises.

It is not necessary to refer to section 156, Title 15, Code, to protect Watson from a charge of trespass in making an arrest which did not occur. But if there had been an arrest or an attempt to do so, that statute would have been pertinent as it has been construed in Watson v. State, 83 Ala. 60, 3 So. 441.

Charges 34, 36 and 47 seek to have the court instruct the jury that in taking appellant's rifle out of his hand when they were in the house, deceased Young was a trespasser or was an offender of some sort. Under these charges that result would follow regardless of the circumstances under which it was done. That act followed very violent threats made by appellant while he had the rifle in his hand, according to some of the evidence, and the charges did not consider the fact that it may have been a reasonable act of self protection under the circumstances.

Charge No. 51 is to the effect that if evidence of self-defense in this case generates in the mind of the jury a reasonable doubt of the defendant's guilt, "it is your duty to acquit" him. This charge may very well be in the same class as the so-called single fact charges which have uniformly been condemned. Kent v. State, 252 Ala. 371, 41 So. 2d 197; Wilson v. State, 243 Ala. 1[45], 8 So.2d 422; Daniels v. State, 243 Ala. 675 [19], 11 So.2d 756; Robinson v. State, 243 Ala. 684 [15], 11 So.2d 732, and it pretermits consideration of the evidence as a whole. Moreover, the court properly charged the jury in that respect in his oral charge.

Charges 63, 64 and 68 are predicated upon the fact that defendant received a blow on his head that affected his mental faculties, so as to prevent him from having a specific intent to kill. Those charges are fully covered by given charges 62, 65, 66 and 67. Moreover, a specific intent to kill is not essential. Fowler v. State, 161 Ala. 1, 49 So. 788; Lewis v. State, 96 Ala. 6, 11 So. 259; Rainey v. State, 245 Ala. 458(9), 17 So.2d 687; Smith v. State, 243 Ala. 254, 11 So.2d 471.

Charge 69 is also fully covered by the court's oral charge. Charge 70 is covered by given charges 71 and 72.

The oral charge of the court, supplemented by the special charges given for defendant, clearly and fully covered every aspect of the issues and contentions made by counsel for appellant. The record shows that the trial was conducted in a careful manner, and that every right of appellant was given him. There was a conflict in some aspects of the evidence, but the verdict of the jury was fully supported. The motion for a new trial was overruled without reversible error.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and GOODWYN, JJ., concur.